IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

COURTNEY SPENCER,

    Plaintiff,

    v.                                                  No. 15-CV-141 MCA/SCY

University of New Mexico Board of Regents,

    Defendant

## MEMORANDUM OPINION AND ORER

**THIS MATTER** is before the Court on *Defendant The University of New Mexico Board of Regents' Motion to Dismiss* and *Memorandum Brief in Support of Defendant's Motion to Dismiss* filed April 27, 2015. [Docs. 7-8] The Court has considered the parties' submissions, the record, the relevant law, and has otherwise been fully advised in the premises.

    **BACKGROUND**

Plaintiff Courtney D. Spencer filed the present lawsuit against Defendant seeking damages arising from Defendant's alleged willful indifference in its response, or failure to respond, to her report of having been the victim of a "gang rape" on and near campus perpetrated by University of New Mexico (UNM) football players. [Doc. 3 p. 1] Plaintiff seeks monetary relief under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C.A. § 1681(a). [Doc. 3 p. 1, 30-31] Defendant seeks dismissal on the ground that Plaintiff has failed to state a viable claim for a private right of action under Title IX. [Doc. 8 p.1]

1

As alleged in Plaintiff's *First Amended Complaint*, the circumstances that led to the present lawsuit are the following. [Doc. 3] During the 2013-14 school year Plaintiff was a freshman at the University of New Mexico (UNM). [Doc 3 ¶ 2] Late in the evening on April 12-13, 2014, two UNM football players, Crusoe Gongbay and SaQwan Edwards, and a former UNM student, Ryan Ruff took Plaintiff, who was incapacitated and disheveled, from an off-campus house party and put her inside Ruff's vehicle. [Doc. 3 ¶¶ 7, 15, 64] A video taken inside the vehicle depicts the three men inside the vehicle chanting the phrase "slutty boys." [Doc. 3 ¶ 18] The video is overlaid with text that reads: "SLUTTYBOY GANGBANG COMIN SOON." [Id.] Plaintiff alleges that "gangbang" means "gang rape." [Doc. 3 ¶ 19] Each of the men had sex with Plaintiff inside the vehicle. [Doc. 3 ¶ 7]

After they had sex with her Gongbay, Edwards, and Ruff dropped Plaintiff off outside of the dorms on UNM campus. [Id.] Plaintiff immediately contacted a security person who, in turn, called UNM police (UNMPD) and, at approximately 2:50 a.m. on April 13, Plaintiff reported to UNMPD what had occurred in the vehicle recalling that one of the men was named "Crusoe." [Doc. 3 ¶¶ 7-8] Plaintiff then underwent a nurse sexual assault examination (SANE examination) in which DNA evidence was collected from Plaintiff's body and her bruising and injuries were documented. [Doc. 3 ¶ 9] DNA from each of the three men was found on Plaintiff's body. [Doc. 3 ¶¶ 25, 30-31] The SANE examination did not include testing for "rape drugs." [Doc 3 ¶ 10]

Days later Plaintiff learned through social media that a video "possibly existed" that depicted her activities prior to her encounter with Gongbay, Edwards and Ruff, and

2

that the video had been seen by other students.  [Doc. 3 ¶¶ 12-14]   After Plaintiff watched some of the videos (it turned out that there were several) Plaintiff realized that she had no memory of the four hours that preceded her encounter with Gongbay, Edwards, and Ruff.  [Doc. 3 ¶¶ 12, 16-18, 70, 87]  Eventually, through social media, UNMPD's investigative reports, and videos provided by a criminal defense attorney for one of the alleged rapists, Plaintiff learned some of what had occurred during those four hours.  [Doc. 3 ¶¶ 12, 14-17, 20-21]  During that time frame Plaintiff, along with two unnamed UNM football players and several other students were together in a campus dorm common room.  [Doc. 3 ¶¶ 20, 36]   According to witnesses, Plaintiff's behavior "changed very suddenly and in a manner [that] made no sense given how little alcohol [Plaintiff] was witnessed to have consumed."  [Doc. 3 ¶ 14]  Witnesses reportedly believed that Plaintiff "acted as if she had been drugged (with a rape drug or some other substance like ecstasy)."  [Id.]  Videos taken during that time frame variously depict Plaintiff "in an apartment or dorm room somewhere, apparently having sex, and standing around partially clothed saying bizarre things."  [Doc. 3 ¶ 20]  The videos show that Plaintiff was "incapacitated," and that she "was acting drugged and dancing around provocatively."  [Doc. 3 ¶ 21]  One of the unnamed football players drove Plaintiff from the campus dorm common room to an off-campus house party from where Gongbay, Edwards, and Ruff picked her up immediately upon her arrival.  [Doc. 3 ¶ 15]  During the drive to the off-campus house party the unnamed football player reportedly "engaged Plaintiff in 'consensual' sexual activity."  [Doc. 3 ¶ 36]  Plaintiff has no memory of the

3

events depicted in the videos taken in the campus common dorm room or of the drive to the off-campus house party. [Doc. 3 ¶¶ 17, 36]

On the morning of April 13, 2014 Gongbay met with Coach Davie, a member of the UNM athletic Department "about the drunk girl situation last night." [Doc. 3 ¶ 22] In the afternoon of April 13, 2014 UNMPD interviewed Gongbay. [Doc. 3 ¶ 24] In his April 13 interview with UNMPD Gongbay denied having been in a vehicle with Plaintiff; he told UNMPD that he had met Plaintiff outside of a party, told her his name and that he was a football player, and he had gone home by himself where he lived alone. [Doc. 3 ¶ 25] On April 15, 2015 an assistant football coach contacted UNMPD to say that Gongbay had an alibi for the entire time that Plaintiff claimed to have been in Ruff's car; a woman claimed that she was with Gongbay during the relevant time frame, and, accordingly, the woman was an alibi witness who "would clear up all misunderstanding about the incident with the 'drunk girl.'" [Doc. 3 ¶ 26] UNMPD immediately interviewed Gongbay's alibi witness, but her testimony was "riddled with inconsistencies" and UNMPD subsequently learned that she had been engaging in text messages with Gongbay from different locations throughout the hours that she claimed to be with him. [Doc. 3 ¶ 27] Further, Gongbay did not live alone, he had a roommate. [Doc. ¶ 64]

On April 21, 2014, Gongbay and Edwards were arrested for their involvement in the alleged "gang rape," Ruff was arrested the following day. [Doc. 3 ¶¶ 29-31] On April 21 and 22, 2014, Gongbay and Edwards were suspended from the football team.

[Doc. 3 ¶ 47]  The district attorney ultimately decided not to prosecute the men.  [Doc. 3 ¶ 55]

On April 23, 2014 Plaintiff requested that Defendant, through its Office of Equal Opportunity (OEO), open a Title IX investigation.  [Doc. 3 p. 2, ¶ 48]  On May 13, 2014, the OEO acknowledged receipt of Plaintiff's request and indicated that it would "soon begin an investigation." [Doc. 3 ¶ 49] (Emphasis omitted).  OEO met with Gongbay and Edwards for the first time on July 1 and 2, 2014 to inform them of the OEO investigation. [Doc. 3 ¶ 50]  Plaintiff alleges that among other problems with OEO investigators, they were inadequately trained in how to perform an investigation into acts of sexual violence, and that one of them, Bryan Brock, expressed favoritism in the media for the UNM football team.  [Doc. 3 ¶¶ 57-60, 76-79]

After her encounter with Gongbay, Edwards, and Ruff, Plaintiff reported to OEO that she "was constantly fearful of attack, had panic attacks being on campus, and moved out of her dormitory residence hall to live off campus with her parents."  [Doc. 3 ¶ 44] Defendant "accommodated Plaintiff somewhat with her coursework after the" incident; however, Defendant did "not accommodate Plaintiff with safety measures and accommodations so that she could safely pursue her studies[.]"  [Doc. 3 ¶ 45, 97 (u)] Defendant did "nothing to eliminate the sexual assault risks posed by Gongbay and Edwards" or to prevent a recurrence of sexual assault.  [Doc. 3 ¶ 97 (s)]  Gongbay and Edwards were not suspended from school and, aside from suspending them from the football team during the off season  when they were arrested, Defendant took no further disciplinary action against them.  [Doc. 3 ¶ 47]

On July 28, 2014 Plaintiff wrote to OEO to request that it consider information and evidence about rape drugs, including that a "nationally known expert career law enforcement detective and trainer . . . was willing to provide . . . her opinions [to OEO] . . . that Plaintiff was apparently given a rape drug and/or other substance, and that the sexual acts in [Ruff's vehicle] were thus drug-facilitated rapes." [Doc. 3 ¶ 51] Plaintiff's letter also mentioned the fact that DNA from Gongbay, Edwards, and Ruff was found on her body, that the men had inconsistent stories, and that a video existed that depicted the men in Ruff's vehicle with Plaintiff, the text of which video indicated that a "gangbang" was about to occur. [Doc. 3 ¶ 51]

### *Alleged Deficiencies in OEO's Investigation*

Plaintiff alleges that OEO "refused to permit [her] to present evidence of any kind that she was drugged with a rape drug or ingested a substance in addition to alcohol which together altered her mental state, precluding her ability to consent to sexual activity[;] . . . refused to accept testimony which would account for her total memory loss, and conduct"; and it "refused to accept and therefore consider [that] evidence as an explanation for the" video clips showing Plaintiff's behavior during the four hours prior to her encounter with Gongbay, Edwards, and Ruff. [Doc. 3 ¶ 52] OEO accepted and considered two video clips showing Plaintiff during the four hours prior to the incident as evidence that Plaintiff consented to sex with Ruff, Gongbay, and Edwards. [Doc. 3 ¶ 53] OEO "ignored" the video taken inside Ruff's vehicle that indicated that a "gangbang" was "comin soon." [Doc. 3 ¶ 54] OEO did not seek or obtain a copy of the SANE examination report that indicated physical proof of forced sexual activity, and in regard to

6

the UNMPD's witness interviews, OEO relied exclusively upon the statement given by the football player who claimed to have engaged in a consensual sex act with Plaintiff as he drove her to the place where she was picked up by Gongbay, Edwards, and Ruff. [Doc. 3 ¶¶ 39, 68] Additionally, during its investigation into Plaintiff's report of the incident, Defendant was aware of the fact that two other women in addition to Plaintiff, and independent of one another, had reported that Gongbay had sexually assaulted them. [Doc. 3 ¶ 41]

On August 12, 2014, the suspensions of Edwards and Gongbay from the UNM football team were lifted. [Doc. 3 ¶ 74] Approximately two weeks later, on August 28, 2014 OEO issued a "Preliminary Letter of Determination" indicating its finding of "No Probable Cause." [Doc. 3 ¶ 61] The preliminary letter of determination noted that OEO "found it significant" that Gongbay had an alibi for the time during which the rapes occurred. [Doc. 3 ¶ 64] The letter also noted that OEO did not interview Edwards or Gongbay and that it determined their credibility based solely upon letters written by their respective private attorneys denying Plaintiff's allegations. [Doc. 3 ¶ 66] OEO also determined that the unnamed football player's statement that Plaintiff consented to a sex act with him on the way to the off-campus house party meant that Plaintiff also consented to sex with Gongbay, Edwards, and Ruff. [Doc. 3 ¶ 39] A final letter of determination was issued by OEO on September 15, 2014, and Plaintiff appealed. [Doc. 3 ¶ 81]

As grounds for her appeal of OEO's determination Plaintiff stated, among other things, that the determination was untimely and premature; it was the result of an investigation which was not thorough; the sexual abuse nurse examiner was not

7

interviewed; UNMPD investigators were not interviewed; the UNMPD investigation was not yet complete; Plaintiff's expert witness was prohibited from testifying; and, although Plaintiff's account of the events had never changed, Gongbay's story, which was credited by OEO, had "changed materially twice, with a third version being depicted on the video of him in [Ruff's vehicle] with Plaintiff"; and that OEO had never interviewed Edwards. [Doc. 3 ¶ 81]  The president of UNM denied Plaintiff's appeal.  [Doc. 3 ¶ 82]

As a result of the foregoing, among other facts alleged in her complaint, Plaintiff "psychologically, emotionally[,] and out of fear for her own physical safety, could not return to UNM" for the remainder of 2014 spring semester or for the fall 2014 semester. [Doc. 3 ¶¶ 44-45, 89]

In her lawsuit against Defendant, Plaintiff does not allege that Defendant is liable for failing to prevent Gongbay and Edwards from having sex with her in Ruff's vehicle when she was incapacitated.  [Doc. 14 p. 5]  Rather, in Plaintiff's words, her Title IX "claim involves only [Defendant's] conduct *after* the [incident] was reported to it."  [Id.] Defendant argues that Plaintiff's *First Amended Complaint* fails to state a viable claim for a private right of action under Title IX and, thus, should be dismissed with prejudice. [Doc 8, p. 1]

**Analysis**

In determining whether Plaintiff's first amended complaint can survive Defendant's motion to dismiss the Court considers whether Plaintiff has stated "a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court accepts, as true, factual allegations in a complaint, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Additionally, in determining whether the complaint states a plausible claim for relief the Court draws "on its judicial experience and common sense"; "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (alteration omitted).

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). "Title IX is . . . enforceable through an implied private right of action," and "monetary damages are available in the implied private action." *Gebser v. Largo Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). Title IX may be enforced only against the recipient of federal funds and the funding recipient may only be liable in damages under Title IX for its own misconduct. *Davis ex rel. Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). Thus, in order to be liable under Title IX the funding recipient *itself* must have, on the basis of sex, acted to exclude a person's participation in, deny a person the benefits of, or subject a person to discrimination under an education program or activity that receives federal financial assistance. *Davis*, 526 U.S. at 640-41. Plaintiff alleges, and Defendant does not argue

9

otherwise, that Defendant receives federal funding and is subject to Title IX.  [see Doc. 3 ¶ 4]

In the context of student-on-student sexual harassment, it is only "in certain limited circumstances" that a private action for monetary damages under Title IX may be brought against a school that receives federal financial assistance.  *Davis*, 526 U.S. at 639, 643.  A funding-recipient school may be held directly liable under Title IX where it is "deliberately indifferent to sexual harassment, of which [it has] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.  Thus, in order to state a Title IX claim that is premised on student-on-student sexual harassment, a plaintiff is required to allege that the school:  "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it . . . deprived the victim of access to the educational benefits or opportunities provided by the school." *Murrell v. Sch. Dist. No. 1, Denver, Colorado.*, 186 F.3d 1238, 1246 (10th Cir. 1999).  "[A] single instance of [student-on-student] harassment theoretically might form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systematic effect of denying access to a scholastic program or activity." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009).

*Actual Knowledge*

Plaintiff alleges, and Defendant does not argue otherwise, that Defendant's report that Gongbay and Edwards[1] had sex with Plaintiff in Ruff's car while she was incapacitated gave Defendant "actual knowledge" of an act of student-on-student sexual harassment. [Doc. 3 ¶ 93; see Doc. 8 p. 14-17]

1. *Deliberate Indifference*

In support of its *Motion to Dismiss* Defendant argues that its accommodation of Plaintiff with her course work, its act of investigating her report of sexual harassment that led to its conclusion that the report lacked probable cause; and its suspension of Gongbay and Edwards from the football team; demonstrate that its response to Plaintiff's report of the harassment was not clearly unreasonable. [Doc. 8 p. 15-16]

"A [school] is deliberately indifferent to acts of student-on-student harassment only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.,* 511 F.3d 1114, 1121 (10th Cir. 2008) (alteration omitted). Title IX does not require a school to "remedy peer harassment" or to "ensure that students conform their conduct to certain rules." *Davis*, 526 U.S. at 648 (alteration and ellipses omitted). Nor does it "require flawless investigations or perfect solutions." *Rost*, 511

---

[1] Plaintiff acknowledges that Defendant did not have disciplinary control over Ruff such that it could be held liable for its response to learning that he was one of the perpetrators of the rapes. [Doc. 14 p. 5] *See Davis*, 526 U.S. at 646-47 (stating that a school's liability under Title IX is limited to circumstances in which "the harasser is under the school's disciplinary authority").

F.3d at 1122 (alteration and ellipses omitted). Rather, the school must "merely respond to known harassment in a manner that is not clearly unreasonable." *Davis*, 526 U.S. at 649.

In considering whether a school's response to student-on-student harassment was clearly unreasonable, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. While hindsight observations that suggest that there were other and better ways to investigate or remedy student-on-student harassment may demonstrate simple or even heightened negligence in the school's response, such observations are insufficient to demonstrate deliberate indifference. *Rost*, 511 F.3d at 1122; *see Fitzgerald*, 504 F.3d at 171 (stating that "'deliberate indifference' requires more than a showing that the institution's response to harassment was less than ideal"). However, a "minimalist response is not within the contemplation of a reasonable response[,]" *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (2000); and deliberate indifference may be indicated where the school fails "to meaningfully and appropriately discipline the student-harasser[,]" or where "the harasser and other students are left to believe that the harassing behavior has the 'tacit approval' of the" school. *S.S. v. Alexander*, 177 P.3d 724, 739 (Wash. Ct. App. 2008).

On a motion to dismiss, a court may "identify a response as not clearly unreasonable as a matter of law." *Davis*, 526 U.S. at 649. The facts of this case as alleged in Plaintiff's complaint, however, do not permit the Court to conclude, as a matter of law, that Defendant's response to Plaintiff's report was not clearly unreasonable.

12

Viewed in the light most favorable to Plaintiff, a reasonable jury could find that the circumstances known to OEO during its investigation were the following.  Plaintiff, having been possibly been drugged with a rape drug or a similar substance that left her incapacitated and caused her to lose her memory for four hours, was transported by an unnamed football player to an off-campus party where she was immediately picked up by Gongbay, Edwards, and Ruff.  A reasonable inference could be drawn that the unnamed football player had arranged in advance to deliver Plaintiff, who was incapacitated, to the three men.   Gongbay, Edwards, and Ruff put Plaintiff, who was, according to a video recording, obviously incapacitated and disheveled into Ruff's car with the intention to engage in a "gangbang" with her. When the three men dropped Plaintiff off at campus she immediately found campus security and reported to UNMPD that she had been raped by the three men, one of whom was named Crusoe.  "Crusoe" was identified by UNMPD by the next afternoon as Gongbay.  Gongbay had reportedly perpetrated sexual assaults on two women prior to his encounter with Plaintiff.  After the incident Gongbay made several statements that were later revealed to be untrue about his whereabouts during, and involvement in, the incident.  DNA from Gongbay, Edwards, and Ruff was found on Plaintiff's body and a SANE examination revealed that she had bruising and injuries.  A cursory investigation was performed by OEO investigators, including among them, one investigator who publicly expressed favoritism for the football team.  The investigation did not involve interviewing Gongbay or Edwards, the investigators ignored substantial relevant evidence that supported Plaintiff's account of events, and they accepted the

clearly controverted version of events offered by the football players to conclude that Plaintiff's report was not supported by probable cause.

Viewed in the light most favorable to Plaintiff, the fact that, under the circumstances here, OEO found that Plaintiff's report of sexual harassment was not supported by probable cause; combined with the fact that Defendant took no disciplinary action against Edwards and Gongbay except to suspend them for four months during football's "off season" could lead a reasonable jury to find that that Defendant's response to Plaintiff's report of sexual harassment was clearly unreasonable in light of the known circumstances. *See Davis*, 526 U.S. at 648 (stating that a school's response to a report of sexual harassment may be deemed "deliberately indifferent" where its "response to the harassment is . . . clearly unreasonable in light of the known circumstances"); *Vance*, 231 F.3d at 260 (stating that a "minimalist response is not within the contemplation of a reasonable response" to a report of student-on-student harassment). A reasonable jury could conclude that temporarily suspending Gongbay and Edwards from the football team during the off season did not constitute reasonable and appropriate discipline for having participated in a "gangbang" with Plaintiff when she was clearly incapacitated, and (in Gongbay's case) having lied to UNMPD during its investigation of the matter. *See S.S.*, 177 P.3d at 739 (stating that deliberate indifference may be indicated where the school fails "to meaningfully and appropriately discipline the student-harasser"). A reasonable jury could also find that Defendant's decision to permit Gongbay, who was reported to have sexually assaulted two women prior raping Plaintiff, and Edwards, who was known to have participated in raping Plaintiff, to remain on campus, without being

subjected to meaningful discipline could lead Gongbay, Edwards, and other student athletes to believe that they could perpetrate acts of student-on-student sexual harassment without facing serious consequences. *See id.* ("It constitutes a deliberately indifferent response if the harasser and other students are left to believe that the harassing behavior has the tacit approval" of the school.).  In sum, the allegations in Plaintiff's first amended complaint, which the Court assumes to be true, satisfy the "deliberate indifference" element required to state a Title IX claim. *See Murrell*, 186 F.3d at 1246 (enumerating the elements required to state a Title IX claim).

### 2. *Harassment that Was so Severe, Pervasive, and Objectively Offensive That it Deprived Plaintiff of the Educational Benefits of the School.*

Defendant argues that, even assuming that its response to Plaintiff's report of sexual harassment demonstrated deliberate indifference, Plaintiff's claim fails because she has not alleged that its deliberate indifference caused her to suffer further discrimination. [Doc. 8 p. 17-20]

A school may not be held liable for damages under Title IX "unless its deliberate indifference subjects its students to harassment. That is, the deliberate indifference must, at minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Davis*, 526 U.S. at 644-45 (alterations omitted).  To "subject" a student to harassment means "to cause [her] to undergo" the harassment, or to "expose" or to make her "vulnerable" to it. *Id.* at 645.  The harassment must be "so severe, pervasive and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

A single act of severe sexual harassment—particularly a rape (Plaintiff characterizes the incident as a gang rape) can support a Title IX claim where the claim is premised upon the school's response to the report of the incident of sexual harassment. *Vance*, 231 F.3d at 259 n.4; *SS.*, 177 P.3d at 742-43.  In the context of Title IX, "there is no 'one free rape' rule"; and a victim does not have to be raped twice before the school is required to respond appropriately.  *SS.*, 177 P.3d at 741.  A jury may conclude that harassment is severe, pervasive, and objectively offensive from evidence that a student who is known to have perpetrated a sexual assault upon another student is permitted to continue attending the same school as the victim, leaving open the potential for interactions between the two.  *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F.Supp.2d 438, 444 (D. Conn. 2006).  Further, "a reasonable jury [may] conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university." *Kelly v. Yale Univ.*, No. 3:01-CV-1591, 2003 WL 1563424, at *3 (D. Conn. 2003).  Thus, where the victim of student-on-student sexual harassment whose report of a rape was met with deliberate indifference by the school *voluntarily* withdraws from school to avoid exposure to further harassment, the voluntary withdrawal may yet support a finding that *the school* "effectively barred her access to an educational opportunity[.]"  *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1296-98 (11th Cir. 2007) (alterations omitted) (reasoning that where a student had been raped by three student athletes, including one whose past sexual conduct was known to the university, and the university's response did not assuage her

concerns of a future attack, her decision to withdraw from the university was "reasonable and expected").

As discussed earlier a reasonable jury could conclude that Defendant's response to Plaintiff's report of the incident of sexual harassment, which she characterizes as a rape, was clearly unreasonable.  Plaintiff alleges that as a result of Defendant's deliberate indifference, including its "deliberate decision to do nothing to eliminate the sexual assault risks posed by Gongbay and Edwards, [or] to prevent its recurrence[,]" her safety was at risk if she continued to attend UNM.  [Doc. 3 ¶¶ 95, 97 (s)]  She also alleged that "psychologically, emotionally[,] and out of fear for her own physical safety, [she] could not return to UNM" for the remainder of the 2014 spring semester or for the fall 2014 semester.  [Doc. 3 ¶¶ 89, 92]   From these facts, a reasonable jury could find that Defendant's deliberately indifferent response to the report of sexual harassment left Plaintiff exposed or vulnerable to a recurrence of harassment by Gongbay and Edwards who may have been led to believe that such behavior was "tacitly" permitted.  *See S.S.*, 177 P.3d at 739 (stating that deliberate indifference is indicated where the school's response to a report of harassment leads the harasser to believe that harassment has the school's tacit approval).   A reasonable jury could also find that Plaintiff's decision to withdraw from UNM rather than accede to these risks was the reasonable and expected outcome of Defendant's response to her report of sexual harassment, and that under these circumstances Defendant effectively deprived Plaintiff of access to the educational opportunities or benefits provided by UNM.  *See Williams,* 477 F.3d 1282, 1296-98

17

Defendant argues that Plaintiff's allegations and her argument in response to the *Motion to Dismiss* show that Plaintiff seeks to hold Defendant liable for its failure to "immediately banish[] the accused harasser[s] from its campus." [Doc. 16 p. 6] Building on that premise, Defendant argues that Plaintiff's claim fails because our Tenth Circuit Court of Appeals has upheld summary judgment in favor of schools in two cases, namely, *Rost*, 511 F.3d 1114; and *Escue v. Northern Oklahoma College*, 450 F.3d 1146 (10th Cir. 2006), in which the accused harasser was permitted to remain on campus following the victim's report of harassment. [Doc. 16 p. 6-7] The Court does not share Defendant's view that Plaintiff's *First Amended Complaint* and her arguments in response to Defendant's *Motion to Dismiss* claim that Defendant's liability under Title IX stems from its decision not to "banish" Gongbay and Edwards from UNM. Plaintiff's allegations and arguments are that Defendant failed to take *any* meaningful disciplinary action against the students who had sex with her while she was incapacitated thereby exposing and making her vulnerable to further harassment that effectively deprived her of an educational opportunity. Thus, while "banishing" (or expelling or suspending) Gongbay and Edwards may have been one of many disciplinary tools available to Defendant, Plaintiff's *First Amended Complaint* does not claim that by failing to take that particular action, Defendant violated Title IX. *See Davis*, 526 U.S. at 648 (stating that victims of student-on-student sexual harassment do not have "the right to make particular remedial demands").

Nor is the Court persuaded that the Plaintiff's claim so closely resembles the facts in *Rost* and *Escue* that, pursuant to those cases, dismissal of Plaintiff's *First Amended*

*Complaint* is clearly required. Although the victims in *Rost* and *Escue* reported severe forms of sexual harassment, the allegations in Plaintiff's complaint set this case apart from the circumstances described in *Rost* and *Escue*. *See Rost*, 511 F.3d at 1117-18 (describing incidents of student-on-student sexual harassment that occurred off school grounds including boys coercing the victim into performing various sex acts, and phoning the victim to pester her for oral sex); *Escue*, 450 F.3d at 1149-51 (describing harassing behaviors perpetrated upon a student by her professor, including acts of touching and sexual comments).

In her complaint Plaintiff alleges that, while she was incapacitated, possibly as the result of having been drugged, she was transported by a football player from an on-campus gathering to an off-campus location where, immediately upon her arrival, she was put in a car by three men, including two UNM football players. The three men "gang raped" her inside the vehicle. The moments preceding the alleged "gang rape" were memorialized on a video that announced an impending "gangbang," and the video was disseminated via social media [Doc. 3 ¶ 87]   The incident left her with documented bruises and injuries, and with DNA from each of the three men on her body. "Rape is unquestionably among the most severe forms of sexual harassment[.]" *S.S.*, 177 P.3d at 737 (quoting *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967-68 (9th Cir. 2002)); *see also Doe ex rel. Doe.*, 451 F.Supp.2d at 444; *Kelly* 2003 WL 1563424, at *3 (recognizing that the possibility of on-campus encounters specifically between rapists and their victims can deprive the victims of educational opportunities).  Without minimizing the experiences of the plaintiffs in *Rost* and *Escue*, the Court does not believe that the

question in the present case— whether Defendant's response to the Plaintiff's report of sexual harassment was "not clearly unreasonable"— may be resolved as a matter of law by comparing it to the responses of the schools in *Rost* and *Escue*.

**CONCLUSION**

The Court concludes that Plaintiff's complaint alleges facts from which a reasonable jury could find that Defendant violated Title IX.

**IT IS THEREFORE HEREBY ORDERED** that *Defendant The University of New Mexico Board of Regents' Motion to Dismiss and Memorandum Brief in Support of Defendant's Motion to Dismiss* [Docs. 7-8] is **DENIED**.

**IT IS SO ORDERED** this 11th day of January, 2016 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge